

*1046662062*

## IN THE DISTRICT COURT OFTULSA COUNTY
## STATE OF OKLAHOMA

TSEGA GRACE TEMNEWO,

               PLAINTIFF,

v.

STATE OF OKLAHOMA, *EX REL.*
OKAHOMA DEPARTMENT OF
HUMAN SERVICES, OFFICE OF CLIENT
ADVOCACY

               DEFENDANT.

)
)
)
)
)
)
)
)
)
)
)

# CV-2020-00672
Case Number:

## LINDA G. MORPISSEY

OCA Case No. 18-14717

DISTRICT COURT
**F I L E D**

JUN 1 5 2020

DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

### PETITION FOR REVIEW OF ADMINISTRATIVE ORDER

WHOEVER, UNDER COLOR OF ANY LAW, STATUTE, ORDINANCE, REGULATION, OR CUSTOM, WILLFULLY SUBJECTS ANY PERSON IN ANY STATE, ... TO THE DEPRIVATION OF ANY RIGHTS, PRIVILEGES, OR IMMUNITIES SECURED OR PROTECTED BY THE CONSTITUTION OR LAWS OF THE UNITED STATES, OR TO DIFFERENT PUNISHMENTS, PAINS, OR PENALTIES, ON ACCOUNT OF SUCH PERSON BEING AN ALIEN, OR BY REASON OF H[ER] COLOR, OR RACE, THAN ARE PRESCRIBED FOR THE PUNISHMENT OF CITIZENS, SHALL BE FINED UNDER THIS TITLE OR IMPRISONED NOT MORE THAN ONE YEAR, OR BOTH...
*18 U.S. Code § 242*

**COMES NOW**, Tsega Grace Temnewo, hereinafter referred to as "Plaintiff," and files her Petition for Review of a Final Order from the Oklahoma Department of Human Services (DHS), Office of Client Advocacy (OCA), hereinafter referred to as "Defendant," placing her name on the Community Services Worker Registry.

### JURISDICTION

1.    The District court review of the Defendant's decision is authorized by 12 O.S. § 951(a). A ... final order made, by any tribunal ... exercising judicial functions, and inferior in jurisdiction to the district court, may be reversed, vacated or modified by the district court, except where an appeal to some other court is

-1-

## EXHIBIT 2

provided by law."

2.      "An appeal under Sec. 951 is perfected by filing in the district court a full and complete transcript of the proceedings had before the "tribunal, board or officer exercising judicial functions," including a transcript of the evidence.[1,2]

3.      While Section 951(a) does not provide for a trial de novo by the district court,[3] Oklahoma case law recognizes that "[w]here a case involves a violation of constitutional rights, an appellate court shall exercise its own independent judgment on questions of both law and interpretation of facts." *Tsotaddle v. Absentee Shawnee Housing Authority*, 2001 OK CIV APP 23, ¶ 15; 20 P.3d 153, 159.

4.      As important, if not more so, the U.S. Supreme Court rule is that "[w]hen de novo review is compelled, no form of appellate deference is acceptable." *Salve Regina College v. Russell*, 499 U.S. 225, 237; 111 S. Ct. 1217, 1224 (1991).

5.      In addition, Plaintiff also invokes this court's jurisdiction under 42 U.S.C. 1983,

---

[1]

Ordinarily, the District court sits as an appeal tribunal and its jurisdiction is limited to the consideration of the transcript and the argument of the respective attorneys thereon. *White*, 1960 OK 188, ¶ 8. "and the proper standard of review for the district court in such cases is whether errors of law were committed by the [Department], and whether the [Department's] findings are supported by the clear weight of the evidence." *City of Muskogee v. Grayson*, 1991 OK 101, ¶ 8, 818 P.2d 491.". *Stripling v. State ex rel. Oklahoma Health Care Authority*, 2017 OK CIV APP 5.

[2]

A delay in requesting the transcript from the Oklahoma Department of Human Services due to State Orders concerning the COVID-19 virus is requiring the complete transcript of the Administrative Hearing held by the Department of Human Services to be promptly filed in this matter as soon as it can be obtained in a form acceptable to the Court.

[3]

*In re White*, 1960 OK 188, ¶ 8, 355 P.2d 404; *City of Sand Springs v. Colliver*, 1967 OK 194, ¶ 0, 434 P.2d 186 (Syllabus 2) (overruled in part) by *O'Rourke v. City of Tulsa*, 1969 OK 112, 457 P.2d 782.

**EXHIBIT 2**

alleging that the applicable Oklahoma Statute, 56 O.S. § 1025.1 *et seq.*and provisions of the Oklahoma Administrative Code provisions O.A.C. 340:100-3-39, under which Plaintiff was stripped of her rights, were in violation of her constitutional rights to due process, adversely affecting her property and liberty interests.

6.  There is no requirement that the plaintiff sue in federal court because state courts have concurrent jurisdiction. *Howlett v. Rose*, 496 U.S. 356, 375(1990). Of course, a defendant in state court may remove to federal court. 28 U.S.C. § 1441.

7.  Unquestionably, State courts have concurrent jurisdiction over Section 1983 claims. *Haywood v. Drown*, 556 U.S. 729, 734–35 (2009); *Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n*, 515U.S. 582, 588–89 (1995); *Howlett v. Rose, supr); Felder v. Casey*, 487 U.S. 131, 139 (1988); *Ark. Writers' Project v. Ragland*, 481 U.S. 221, 234 (1987);

8.  Further, and very importantly, State courts may not apply state law immunity defenses to Section 1983 claims. P*atsy v. Bd. of Regents*, 457 U.S. 496, 506–07 (1982).

9.  In cases arising from state court Section 1983 actions, the Supreme Court has generally held that the same federal rules that govern the litigation of Section 1983 actions in federal court also govern the litigation of Section 1983 actions in state court. *Howlet, supra*.

10. The usual rule requiring the exhaustion of administrative and judicial state remedies is not a prerequisite to a Section 1983 action. *Monroe v. Pape*, 365 U.S. 167, 183 (1961), *Patsy v. Florida Board of Regents*, 457 U.S. 496, 501 (1982).

-3-

**EXHIBIT 2**

11.   Also, the existence of concurrent state remedies is not a bar to a Section 1983 action. *Zinermon v. Burch,* 494 U.S. 113, 124 (1990).

12.   The general rule is that an agency lacks authority to determine the constitutionality of statutes.

## STANDARD OF REVEIW

13.   In cases where an adjudication has been challenged as violating a constitutional protection, Oklahoma case law recognizes that "[w]here a case involves a violation of constitutional rights, an appellate court shall exercise its own independent judgment on questions of both law and interpretation of facts." *Tsotaddle v. Absentee Shawnee Housing Authority,* 2001 Ok Civ App 23, ¶ 15, 20 P.3d 153, 159.

14.   Pre-dating the Oklahoma Supreme Court ruling, the U.S. Supreme Court has said "[its] duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.". *New York Times Co. v. Sullivan, supra.* In such cases, the U.S. Supreme Court has said "it [is] only natural that [the Court] should conduct an independent review of the evidence on the dispositive constitutional issue." *Bose Corp. v. Consumers Union of U.S. Inc.,* 466 U.S. 485, 508, 104 S. Ct. 1949, 1963 (1984).

15.   Emphatically, the U.S. Supreme Court has said that "[w]hen de novo review is compelled, no form of appellate deference is acceptable. " *Salve Regina College v. Russell,* 499 U.S. 225, 237, 111 S. Ct. 1217, 1224 (1991).

16.   Clearly, constitutional issues are questions of law involving constitutional

-4-

## EXHIBIT 2

protections, the agency's authority or jurisdiction, the legality of an agency's procedure, or error in determining the law, and present questions of law that the reviewing court must independently decide *de novo*.

## STATEMENT OF FACTS

### UNCONTROVERTED FACTS

17. On or about October 16, 2017, the Plaintiff, a Habilitation Training Specialist (hereinafter "HTS"), was present and on duty and providing services to Shannon Asbill (hereinafter "SA") that her employer, S-Q Home Care Specialties (hereinafter "S-Q"), was contracted to provide.

18. In a report sent by DHS to Creek County District Attorney, the Plaintiff was alleged to have deliberately or reckless committed homicide.

19. Plaintiff is an immigrant, a person of color, a naturalized citizen, and an ordained minister.

20. Plaintiff can be difficult to understand due to her accent and less than perfect English.

21. On or about October 16, 2017, SA was transported by ambulance to St. John Hospital in Tulsa, Oklahoma.

22. SA was unable to vocalize his needs to any caretaker.

23. On at least three (3) occasions SA was admitted to a hospital for treatment of aspiration related pneumonia.

24. Prior to his final hospital visit it was recommended by his treating physician that a feeding tube be inserted to prevent aspiration of his food.

25. The guardian and father of SA, Ronnie Asbill, refused to allow the insertion of a

-5-

## EXHIBIT 2

feeding tube.

26. On or about October 16, 2017, SA was transported to the hospital in declining health. This was not the first time that SA was admitted for the breathing problems due to aspiration.

27. Earlier in the week, on or about October 10, 2017, SA was in the hospital for pneumonia due to aspiration.

28. Earlier in the year, on or about January 10, 2017, SA was in the hospital for aspiration pneumonia.

29. On or about January 10, 2017, SA's treating physician indicated that SA should be put in hospice care.

30. On or about October 24, 2017, SA succumbed to the maladies that had plagued him for many years, which was a full week following his admission to St. John Hospital in Tulsa.

31. During the time SA was in St. John hospital, surgery was performed on SA to remove kidney stones that had block his urinary tract.

32. The primary cause of death was sepsis with an underlying cause being a urinary tract infection caused by kidney stones and pneumonia.  The Medical Examiner (hereinafter, ME") denoted the primary underlying cause to be a urinary tract infection. The ME indicated that the death of SA was from natural causes. ***Aspiration* pneumonia was not listed as a cause of death.**

**EXHIBIT 2**

16If a malicious witness rises up against a [woman] to accuse [her] of wrongdoing,

17then both the [women] who have the dispute shall stand before the Lord, before

the priests and the judges who will be in office in those days. 18The judges shall

investigate thoroughly, and if the witness is a false witness and [s]he has accused

h[er] [sister] falsely, 19then you shall do to h[er] just as [s]he had intended to do

to h[er] [sister]. *Deuteronomy 19:16-19*

## CONTROVERTED FACTS

33. The Death Certificate for SA issued by the medical examiner for the State of Oklahoma did not list aspiration pneumonia as a cause of death, but did list the death was due to natural causes.

34. No autopsy was performed. The facts of this case beg the question: Why, if a homicide is suspected was an autopsy not requested or required? If the Medical Examiner suspected an unnatural cause of death or a homicide an autopsy would have been required by statute.

35. **The District Attorney declined to prosecute the Plaintiff, yet two years later DHS embarks on a quest to disqualify the Plaintiff from her career by re-alleging the Plaintiff was responsible for the death of SA.**

36. The statement made at the hearing and in the Summary of Investigative Finding that the Plaintiff refused to take SA to the hospital is a contrivance of the highest order. Had the Plaintiff's car malfunctioned or had it been obstructed by a traffic jam, DHS would have then claimed she was acting with reckless disregard for

**EXHIBIT 2**

SA's safety. Additionally, her automobile is not equipped with lights, sirens and live saving equipment.

37.    If Ms. Watashi was present to see the Plaintiff "feed" SA, as she claims, then why did she not help the Plaintiff remove SA from his bed and place him in his wheelchair so the Plaintiff could drive SA to the hospital? It took two people to move SA from the bed to the wheelchair and the Plaintiff did not have such help available. Additionally, it is absurd to think that the Plaintiff should have driven SA to the hospital. The Plaintiff was not the guardian nor is she licensed in, or trained for, emergency medical transport.

38.    The conversation Ms. Watashi had with the unnamed doctor at St. John Hospital in Tulsa, Oklahoma, seems unlikely because he too is bound by HIPPA to not divulge any information until the individual is identified and determined to have a right to know. Ms. Watashi was not the legal guardian and did not have a right to know, nor was she employed by the DHS or the State of Oklahoma.

39.    Likewise, the reported conversation that Ms. Watashi supposedly had with the ambulance driver seems very suspicious. Medical emergency responders are bound by HIPPA and Ms. Watashi was not the legal guardian of SA and did not have a right to know, nor was she employed by the DHS or the State of Oklahoma.

40.    **Hearsay testimony by Ms. Watashi was admitted because of the loose evidentiary rules for administrative hearings whereby Ms. Watashi recounted in her testimony information offered to her by an unnamed and nondescript Creek County ambulance driver and an unnamed hospital**

-8-

**EXHIBIT 2**

**doctor. The testimony was clearly unreliable yet the Administrative Law Judge (hereinafter "ALJ") relied heavily on those third party statements in the Order he issued.**

41.   Ms. Watashi claimed that she "saw" the Plaintiff "feed" SA which is disputed by the Plaintiff. Ms. Watashi's claim is not supported by the contemporaneous records kept in the regular course of business. SA was fed in and around midnight and Ms. Watashi was not present when SA was fed.

42.   The Plaintiff did not "feed" SA during the time that is claimed by the State's witness, Ms. Shirley Watashi.

43.   On or around 7:30 A.M. the Plaintiff crushed an Acetaminophen and put it in a ½ teaspoon of apple sauce, per Haresh K. Ajmira, M.D.'s order, and administered it to SA to reduce his fever.

44.   **If Ms. Watashi saw the Plaintiff inappropriately administer medication to SA, as she claims, why did Ms. Watashi not intervene to correct the Plaintiff.**

45.   The claim that the Plaintiff was studying for finals, or any other type of tests, causing her to be negligent in caring for SA is clearly erroneous. It was not the season for final exams and no mid terms were scheduled for that period.

46.   Testimony offered by a DHS witnesses, Anthony. J. Brower, HST, and Ms. Watashi indicated that the Plaintiff deliberately or negligently left SA in a soiled bed and in a soiled diaper yet the requirements of how often the HTS was to check on SA for waste resulting from alimentation was never provided to the ALJ.

47.   SA was incapable of verbal communication. The Plaintiff, who took care of SA

**EXHIBIT 2**

for over 4 years without incident, was asked by SA's guardian, Ronnie Asbill, to move to the newly contracted  residential services, S-Q Residential Services, Inc. so she could continue to care for SA.

48.    The ALJ refused to consider and give weight to any exculpatory testimony or report made by the Plaintiff and failed to apply logic to the testimony of each witness. It begs the question as to whether the ALJ gave too much weight to the testimony of DHS because of the number of witnesses rather than the substance of **all** of the testimony presented.

49.    The ALJ personally objected to and stifled the main witness on behalf of the Plaintiff.

50.    An interpreter was not present and it appears that the ALJ did not understand the Plaintiff's verbal communication.  Without an interpreter, the due process rights of the Plaintiff were violated.

51.    Finally, DHS, OCA did not disclose the location of the guardian to the Plaintiff so the Plaintiff's counsel could attempt to interview him. This made it impossible to have the District Court issue a subpoena to compel his appearance at administrative hearing.

## ARGUMENTS AND AUTHORITIES

### REQUEST FOR TRIAL DE NOVO

It is well established in law that an appellate court may review the facts upon which an Order issued as a result of an administrative hearing when there is an issue of a constitutional rights violation. *Tsotaddle v. Absentee Shawnee Housing Authority*, 2001 Ok Civ App 23.

In the instant case, there is a question as to whether the Administrative Law Judge

-10-

## EXHIBIT 2

(hereinafter, "ALJ") could adequately hear and understand the Plaintiff due to her accent and less than perfect command of English. Since there was the potential for incarceration given the charges made against the Plaintiff by DHS, the ALJ should have insisted that an interpreter be present. There needed to be certainty that theALJ could understand the testimony of the Plaintiff.

Unless, or until, Plaintiff's counsel has an opportunity to obtain the record of the administrative hearing to refresh his memory, Plaintiff's counsel does not recollect the ALJ stating a need for an interpreter nor asking if one is needed. Without adequate communication with and understanding by the ALJ for Plaintiff's testimony, the due process rights of the Plaintiff were violated. In reading the Order issued by the ALJ, it is clear that the ALJ did not understand the testimony given by the Plaintiff. (It should be noted that the Plaintiff had no difficulty understanding the questions she was asked at the hearing.)

Additionally, given the fact that DHS was unable to find a key witness (while indicating that it could not compel a prospective witness to testify), Ronnie Asbill. It seems a little bit more than disingenuous given the fact that DHS was making regular payments to Mr. Asbill for the use of a house by another patient. This was not the only due process problem as the ALJ cut short the testimony of Sonya Hamilton of S-Q as she was explaining the S-Q position regarding the SA death and surrounding circumstances. This was a bald face attempt to manipulate the record by preventing the Plaintiff the benefit of exculpatory evidence.

A further attempt by DHS to shield the identity of two potential witnesses from the Plaintiff and her counsel occurred by ambush when hearsay evidence was admitted and relied upon by the ALJ in his Order. The statement by Ms. Watashi that she spoke with an ambulance driver and a doctor about the condition of SA and that they provided medical information and supposed diagnosis seems suspect because EMS personnel are bound by HIPPA. That evidence was

-11-

**EXHIBIT 2**

inherently unreliable as there was not evidence to support Ms. Watashi's claims in the form of medical records and expert testimony. The names of the doctor and the Creek County Emergency Medical Services tech were not provided to the Plaintiff or her counsel. There was not opportunity to cross examine two people whose hearsay statements appear to have formed part of the basis of the ALJ's decision. It appears that every attempt was made to prevent the Plaintiff from obtaining information critical to her defense.

### SUBSTANTIVE DUE PROCESS NOT AFFORDED THE PLAINTIFF

The inability of the State to "find" Ronnie Asbill violates the Plaintiff's substantive due process as she has a right to confront her accusers. By hiding Ronnie Asbill, the EMS driver, and the emergency room doctor's identity if made it virtually impossible to properly prepare for the ambush that was made by DHS. *In State ex rel. Oklahoma State Board of Behavioral Health Licensure v. Matthews-Glover*, 2019 OK CIV App 76, the Court stated that "substantive due process of law is the general requirement that all governmental actions have a fair and reasonable impact on the life, liberty, or property of the person affected." Destroying a person's career and livelihood amount to a substantial impact on the Plaintiff's life and property which may eventually affect her right to liberty.

### INSUFFICIENT EVIDENCE TO MEET THE CLEAR AND CONVINCING STANDARD

The clear and convincing standard is employed "in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interest at stake in those cases is deemed to be more substantial than mere loss of money and some jurisdictions reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof." *Addington v. Texas*, 99 S. Ct. At 1808. This is the situation with the case at bar, the Plaintiff will lose her livelihood, a chance at a nursing career and have her reputation

-12-

### EXHIBIT 2

tarnished beyond repair. A reasonable and unbiased review of the entire record will find substantial inconsistencies in the testimony and actions of Ms. Watashi and DHS. There are real inconsistencies, unlike like the blatantly inconsistent statement by the ALJ in his Order, where he discusses the supposed negligence by the Plaintiff for studying. The Plaintiff made it clear that she was not studying on the evening when SA became seriously ill. As per the testimony ignored by the ALJ, the Plaintiff did not have final exams, or any exams at all, for which she needed to study. Again, the Plaintiff was not studying while taking care of SA on the date in question.

Plaintiff's counsel is baffled by the judges ruling that the evidence was clear and convincing. The State did not prove that the Plaintiff was negligent. In fact an objective and thorough examination of the facts will find several significant and serious inconsistencies in the testimony of more than one of the States witnesses. Clear and convincing is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." In re C.G., 1981 OK 131, ¶ 17 n. 12, 637 P.2d 66, 71 n. 12. ALJ wrote that he found clear and convincing evidence that the Plaintiff improperly cared for SA. An objective analysis of the facts could lead a reasonable mind to emphatically disagree. The Plaintiff was not feeding SA when his temperature rose to 100.4 degrees. However, as per doctor's orders, the Plaintiff properly raised the bed to administer Tylenol by crushing the pill and putting in a ½ teaspoon of less of applesauce. **The administration of medication is not and was not a feeding.** Additionally, it was well known by DHS that SA could not eat, swallow or take medication in a lying state, if SA was lying flat his head could not be held in a position to even get food in his mouth. For DHS and Ms. Watashi to assert that the Plaintiff did something that was physically impossible is quite a bold misrepresentation.

-13-

**EXHIBIT 2**

## FAILURE TO MAKE FINDINGS OF FACT BY THE ADMINISTRATIVE LAW JUDGE

A close reading of the Order entered by the ALJ leaves one wondering what facts exactly was the ALJ considering to determine what was clear and convincing to the Court. Without a clear statement of the facts and the law that is being applied makes it more than difficult to discern what exactly to appeal. This is also a violation of substantive due process, the right to appeal, and may thwart the ability of the Plaintiff to effectively make an appeal of a clearly erroneous decision.

## PLAINTIFF WAS NOT NEGLIGENT IN PROVIDING CARE TO SHANNON ASBILL

In testimony, the Plaintiff was accused of studying, improperly feeding SA, failing to keep SA clean and dry, and refusing to **take** SA to the hospital. The studying and improper feeding have already been addressed. Accusing the Plaintiff of wrong-doing for allegedly refusing to take SA to the hospital is an absurdity that shocks the conscience. As noted in the facts, it took **two** people to move SA from the bed to the chair. The Plaintiff is a small person and could not handle the task by herself. If Ms. Watashi was present, as she claims, to see the Plaintiff allegedly improperly feed SA then why didn't she help move SA from the bed to the wheelchair? Also, if Ms. Watashi was watching the Plaintiff feed SA, as she claims, why did she not stop the improper feeding by intervening in the feeding process? Finally, if the Plaintiff was the cause of SA's last illness, which she clearly was not, why did the ME determine that the death was from natural causes? If the Plaintiff was the proximate cause of SA's aspiration problem, why did DHS not provide the medical records of SA to Plaintiff's counsel and the ALJ? Why was there no expert testimony that verified to the ALJ that what DHS and Ms. Watashi were alleging was correct? Finally, the Plaintiff was not a licensed EMS professional and was not insured for that profession making it ridiculous that she was even asked to drive a seriously ill patient from

-14-

## EXHIBIT 2

Sapulpa to St. John Hospital in Tulsa.

## DHS DID NOT PROVIDE EXPERT TESTIMONY TO REFUTE THE MEDICAL EXAMINER'S REPORT

As noted above, DHS was attempting to go behind the ME's report and ascribe blame to the Plaintiff when the ME found no wrongdoing. A death certificate is a legal document with legal conclusions that can only be officially made by the ME. DHS is ignoring that fact and the Court should ask why and require strict proof of in the form of records and expert testimony. If such testimony had been offered the evidence may well have been clear and convincing. However, without such evidence, and its thorough vetting, the evidence is not clear and convincing. Nor is it worthy of depriving a dedicated individual of her livelihood and reputation. It is for this reason that this matter should be dismissed at best or at least given a trial de novo.

*Wherefore*, the Plaintiff asks this honorable court to review the record and grant her a dismissal or at least a trial de novo. She also requests that the placement of her name on the Registry be stayed until the disposition of this matter. The Plaintiff further prays for such other relief as the Court deems equitable.

Respectfully submitted,

Ronald D. Wilkinson, OBA #15157
5502 South Joplin Avenue
Tulsa, Oklahoma 74135-7563
Telephone: (918) 361-9652
Email: rdavidwilkinson@msn.com

-15-

**EXHIBIT 2**